**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

SARAH WHEELER,      :
             :
    Plaintiff,     :   **Case No. 2:16-CV-1159**
             :
   v.        :   **JUDGE ALGENON L. MARBLEY**
             :
CITY OF COLUMBUS,     :   **Magistrate Judge Vascura**
             :
    Defendant.    :

## <u>OPINION & ORDER</u>

This matter comes before the Court on Defendant City of Columbus's Motion for Summary Judgment. (ECF No. 32). Plaintiff has filed a memorandum in opposition (ECF No. 36) and Defendant has filed a reply. (ECF No. 39). In addition, Plaintiff has submitted a Motion for Leave to File a Sur-Reply. (ECF No. 40). This Court held oral argument on Friday, July 19, 2019 at 11:00 AM. Having considered the briefing of the parties and the arguments made in court, for the following reasons, Defendant's Motion is **DENIED IN PART AND GRANTED IN PART**. In addition, Plaintiff's Motion for Leave to File is **GRANTED**.

## I.  BACKGROUND

Plaintiff Sarah Wheeler is an Army veteran who decided to become a police officer. In 2013, she entered the academy to become a member of the Columbus Police Department (CPD). To become a CPD officer, recruits complete six months of mostly classroom training at the academy, followed by four "phases" of on-the-job training, accompanied by Field Training Officers (FTOs). FTOs are more senior officers who volunteer for the job of training new officers. (CPD compensates FTOs, who take on this responsibility in addition to all their other duties, by giving them more leave time). FTOs supervise and train the probationary officers

(POs), and complete the paperwork documenting how well the POs are progressing. POs must successfully complete all four phases of training to graduate.

Plaintiff completed all four phases of her training, but at the end of Phase IV, her FTO, Officer Joseph Houseberg, did not recommend her for advancement, citing Plaintiff's failure to meet expectations in specific areas, including location and navigation, officer safety, and use of the radio. The FTO does not make termination decisions, however, just recommendations, and so Officer Houseberg's recommendation went to the FTO Sergeant, at the time Sergeant Laura Suber.

Sgt. Suber reviewed Plaintiff's file and spoke with Officer Houseberg. Seeing that some of the runs Plaintiff completed were not documented, and out of a sense for how much time was invested both by Plaintiff and by CPD, Sgt. Suber wanted to give Plaintiff "every advantage to succeed." (ECF No. 29, Ex. 11 at 74) (hereafter "Suber Deposition"). She decided to put Plaintiff on probation and give her the opportunity to complete more training in order to pass and graduate the program. This involved assigning Plaintiff to then-Sergeant (now Lieutenant) Garner for more training, and Sgt. Garner would do "ride-alongs" with Plaintiff to observe her in action.

After observing Plaintiff in action and during at least two ride-alongs, Sgt. Garner did not make a specific recommendation to Sgt. Suber about whether to advance or terminate Plaintiff, but he did forward along the reports he had been keeping while observing Plaintiff. (ECF No. 29, Ex. 2 at 57:7-14) (hereafter "Garner Deposition"). After reviewing these further efforts by Plaintiff, Sgt. Suber was "concerned this wasn't going as well as…hoped." (Suber Deposition at 101:7-8). Sgt. Suber decided she would not recommend Plaintiff for advancement.

Sgt. Suber met with Plaintiff on December 5, 2013, at police headquarters and explained her decision to Plaintiff. (Suber Deposition at 116:15-23). Plaintiff was given the option of either being terminated by the department or resigning in lieu of termination. Plaintiff refused several times to "burn" her time writing a resignation letter (ECF No. 29, Ex. 17 at 316:13) (hereafter "Wheeler Deposition") and so was terminated by the Department.

Plaintiff now brings this suit, alleging she was discriminated against by CPD on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*; and the Ohio Laws Against Discrimination, O.R.C. § 4112.01, *et seq*. Plaintiff also alleges her termination was unlawful because it was retaliatory, in violation of Title VII and the Ohio Revised Code.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). It is proper to enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322 (quoting *Anderson*, 477 U.S. at 250).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

### III.    LAW & ANALYSIS

Plaintiffs who allege they suffered unlawful discrimination in violation of Title VII have four ways to prove their case: by providing direct evidence of discrimination, by providing circumstantial evidence of discrimination, by arguing a mixed-motive case, or by arguing the cat's paw doctrine. Despite a memorandum *contra* containing fifty-five[1] pages of argument, it is unclear which of these theories Plaintiff seeks to advance, because Plaintiff's brief alternately

---

[1] *Cf.* Local Civil Rule 7.2(a)(3) ("The Court prefers that memoranda in support of or in opposition to any motion or application to the Court not exceed twenty pages.").

cites all of these, though argues none fully. In any event, it appears to be the practice of this Circuit to discuss each of the possible avenues when presented with a question such as this. *See e.g. Chattman v. Toho Tenax America*, 686 F.3d 339 (6th Cir. 2012). Accordingly, this Court will briefly discuss each of these possible theories.

### A. Direct Evidence

A plaintiff may prove her Title VII case with direct evidence. In general, direct evidence "is evidence that directly proves and, if accepted by the jury as true, conclusively establishes a fact, without any inference." 23B Am. Jur. Pl. & Pr. Forms Trial § 239. In the Title VII context, direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). A plaintiff who presents direct evidence of discrimination does not proceed through the familiar *McDonnell Douglas* burden-shifting framework, see *infra*; rather, the plaintiff's case-in-chief is met, and the "burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment had it not been motivated by discrimination." *Jacklyn*, 176 F.3d at 926 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 224-5 (1989) (plurality)).

Plaintiff never squarely states what she believes is direct evidence of discriminatory intent on the part of CPD. This Court infers she must be submitting for consideration the statements of then-Sgt. Garner.[2] *See Price Waterhouse*, 490 U.S. at 250 (concluding that sex stereotyping is a Title VII violation). According to Plaintiff's deposition, during the ride-alongs

---

[2] "Whether the paternalistic and sexist comments of Sgt. Garner constitute direct or merely exceedingly probative circumstantial evidence is not even dispositive. Telling Officer Wheeler that she was not qualified to be a police officer because she was a woman is about as direct as evidence could be." (ECF No. 36 at 48).

with Sgt. Garner, he asked her questions about her family and about being a woman in a "man's job." She testified:

> I knew it was going to be a tough ride-along with him for the reason being is the first conversation in a cruiser is questioning me about my family and, How does your family feel doing a man's job? How are your kids going to feel with the schedule? How does your husband feel? It was pretty much, You are a woman doing this man's job. How is your family going to feel about this? How are you going to feel about this? Do you feel good about it? Like it was pretty much, This is going to be a tough road the next couple ride-alongs."

(Wheeler Deposition at 295:10-22).

Asked what else she remembered about the ride-alongs with Sgt. Garner, Plaintiff testified:

> We had a long conversation in reference to that. He -- he like dug into my family and how being a woman in this job and he was comparing and contrasting. Like he wanted me to see like everything that being this woman in this field is going to be rough. Maybe I'm not cut out for the job. How are your kids going to act when mommy is on night schedules and not around as much due to all the overtime? Pretty much like scaring me.

(Wheeler Deposition at 296:1-9).

But in a "timeline" Plaintiff wrote before she approached counsel in this matter, she describes the interaction with Sgt. Garner differently. (Wheeler Deposition at 333:4-334:6) (describing the provenance of the "timeline"). She wrote that after the first ride-along, Sgt. Garner debriefed her, and then the two had "a long conversation."[3]

> [Sgt. Garner]: Wheeler, how's family life? Cause problems at home can affect the performance at work?
>
> [Wheeler]: Life at home is going well, though at the beginning (January 2013) was rough due to life changes. Though, Jared is doing much better with the life changes and very supportive.

---

[3] The conversation is reproduced here as it appears in the document Plaintiff wrote.

G: Have you ever thought this was not for you? Or maybe a smaller department would be better for you, since Columbus is so big? Cause if so, you can resign and nobody would think differently or badly of you.

W: *sigh, tears*…No, I believe that I can do this job. Though I do feel like there is a black cloud over my head, since completion of Phase Four and all the negative rumors. People were more friendly and more approachable until the word (rumors) on the streets was out, then I start to constantly be knit picked on unless they were true friends or officers that did not believe in rumors.

G: Well, I only grade only what I see and not from the past. Obviously your [sic] upset now, do you want to go home or stay?

W: I will stay because you don't learn staying at home.

G: Well, let's go to Headquarters for 10-23 (errands). Have you ever heard of the peer assistance?

W: Yes.

G: You should reach out to them. My old partner, Jennifer Mancini, she helps with the peer assistance and may help.

W: *silence*…

(ECF No. 29, Ex. 18 at 109).

The other possible instance Plaintiff could conceivably be asserting constitutes direct evidence of discrimination is what is repeatedly referred to in the depositions as "the table." For Phase IV, Plaintiff was assigned to Officer Kenneth Kropp. She alleges that on her first day in his precinct, she was told to introduce herself to the precinct by standing on the table. Specifically, she alleges Officer Kropp told her to "dance" on the table to introduce herself. (*See e.g.,* Wheeler Deposition, 151:23-152:2; 152:23-153:3). Plaintiff testified that she never reported the comment (*e.g. id.* at 156:6-13) but also that she did not hear the same request being made of her male colleagues who were also beginning a new Phase that day. (Wheeler Deposition at 153:23-154:2). At his deposition, Officer Kropp was asked how new officers introduce themselves to the precinct, and he testified that although officers have "gotten on a table to

7

introduce themselves" in the past, that is no longer typical. (ECF No. 29, Ex. 5 at 65:22-66-5) (hereafter "Kropp Deposition"). Kropp testified "we were told to stop it" – that is, the table-introduction tradition – by Sgt. Suber. (*Id*. at 66:9-11). Kropp also testified that he never asked Plaintiff to get on the table to introduce herself (*Id.* at 66:20-22) and that Plaintiff never spoke with him about the incident. (*Id*. at 69:21-70:3).

Thus although Plaintiff does not appear to directly make these allegations, plausibly she could argue that any of these three incidents constitutes direct evidence of sexism in the workplace. To complete her case-in-chief, however, Plaintiff must "establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [sex], but also that the employer acted on that predisposition." *Hein v. All America Plywood Co., Inc.,* 232 F.3d 482, 488 (6th Cir. 2000). This is where Plaintiff's direct evidence case must fail. Assuming, *arguendo*, that the interactions with Officer Kropp and Sgt. Garner constitute direct evidence of sexism, Plaintiff has presented no evidence to indicate that her employer acted on that discriminatory basis when she was recommended for termination. This is for two reasons.

First, neither Officer Kropp nor Sgt. Garner was the decision-maker in Plaintiff's case. Officer Kropp actually recognized he and Plaintiff had a personality conflict and requested that he be replaced as her FTO. (Suber Deposition at 58:8-63:7). Sgt. Suber allowed this, and Plaintiff worked with Officer Joseph Houseberg for the remainder of that Phase. Officer Kropp memorialized his impressions of Plaintiff in an email to Sgt. Suber (ECF No. 29, Ex. 6 at 27-28), but he did not have any input in whether she was retained or terminated. In the ordinary course, FTOs may make recommendations, but they do not make the ultimate decision about whether to retain or terminate a probationary officer. This would have been true of Officer Kropp twice over

– first, because he was only an FTO, and second, because he handed over responsibility for training Plaintiff to Officer Houseberg and did not stay her FTO for the entire phase.

Sgt. Garner similarly did not have decision-making authority in Plaintiff's case. When Officer Houseberg recommended she not advance and Sgt. Suber decided to give Plaintiff one more opportunity, Plaintiff was assigned to Sgt. Garner. Again, Sgt. Garner would have been documenting his impressions of Plaintiff and conveying his perspectives up the chain of command, but he did not have the power to retain or dismiss Plaintiff on his own. (Garner Deposition at 57:7-14). As a result, even if the comments by these men constituted direct evidence of sexism, Plaintiff cannot show that CPD acted on that predisposition.[4]

Second, Plaintiff cannot show CPD acted on a sexist predisposition because CPD has ample evidence to indicate that instead, Plaintiff was terminated for cause. Specifically, Plaintiff was terminated because of concerns that she struggled to navigate, she struggled with the radio, she struggled in the area of officer safety, and she did not make progress on her weaknesses such that CPD could be sure she could operate as a single-officer unit in the field without being a liability. Although the number of "unacceptable" ratings differs from Phase to Phase – which gives the impression that perhaps Plaintiff was proceeding apace through the first three Phases before she stumbled in Phase IV – in fact, the comments of her FTOs through even the first three Phases presage the struggles that her supervisors would document in Phase IV and beyond.

Officer Karen Blair was Plaintiff's FTO for Phase II. In Week Four of probation, the first week Plaintiff spent with Officer Blair, Officer Blair memorialized her impressions of Plaintiff's progress. Under "officer weaknesses," Officer Blair wrote, "PO often struggles to relay messages

---

[4] To the extent Plaintiff tries to argue that the negative impressions these men formed of her were as a result of their sexism and that *that negative impression* is what led Sgt. Suber to her ultimate termination decision, this does not constitute direct evidence. Instead, this argument forms her Cat's Paw theory, and is discussed below.

to radio correctly and the dispatcher has to ask questions taking up more time on the radio."
(Wheeler Deposition at 74:10-13; *see also* ECF No. 29, Ex. 1 ("Blair Deposition") at 40:14-17 (a
supervisor's summary of Plaintiff's progress having read Officer Blair's reports); 43:10-13
(same); 46:17-23 (same)). In the next paragraph, Officer Blair wrote, "PO needs improvement in
her mapping skills and becoming more familiar with directions and how to respond to locations
quickly. PO is able to find locations on her map but struggles to apply the map to where she
currently is." (Wheeler Deposition at 75:21-76:1). Plaintiff also struggled in the area of officer
safety. She patted down an individual who was to be transported to the jail, but the deputy at the
jail performed a second pat-down and "found several coins" in the back pocket. Officer Blair
wrote, "FTO discussed with PO the importance of conducting a thorough prisoner search for
safety reasons." (Wheeler Deposition at 77:22-78:3).

These themes recur during Plaintiff's time at CPD. After the first week she worked with
Officer Houseberg for Phase IV, he memorialized his impressions of Plaintiff. He wrote, "PO
Wheeler displays a hesitation when using the main radio channel." (Wheeler Deposition at
227:20-21). During her deposition, Plaintiff appears to argue that any struggles with the radio
were because the recruits were given inadequate practice at the academy, but this hardly falsifies
the impressions of multiple FTOs over a three-month period. (Wheeler Deposition at 229:4-6).

More importantly, Plaintiff's protestations about the contemporaneous reports of her
weaknesses ring hollow because she does not similarly protest the reports of her strengths. She
cannot reasonably maintain the position that her strengths are reported accurately but her
weaknesses are falsified – especially when, as here, the weaknesses have consistencies through
the Phases. For example, asked if she has any reason to dispute Officer Blair's summary of her

strengths, Plaintiff said no. (Wheeler Deposition at 73:16-22). Then Plaintiff was asked about Officer Blair's summary of her weaknesses.

> Q. And then she [Officer Blair] lists probationary officer weaknesses and weekly corrective training. Do you have any reason to dispute anything that she wrote in there?
>
> A. I didn't get those read. Can I read them real quick first?
>
> Q. Absolutely.
>
> A. Okay.
>
> Q. Any reason to dispute anything that she wrote there?
>
> A. No.
>
> Q. So under officer weaknesses she writes, "PO often struggles to relay messages to radio correctly and the dispatcher has to ask questions taking up more time on the radio." What do you recall about that scenario?
>
> A. I don't remember exactly on this precise, but we didn't -- we didn't do much radio communication through the academy. So this was new. So just learning the basics in getting quick on and off. It was -- I kind of probably talked longer than I needed to.

(Wheeler Deposition at 73:23-74:20).

These multiple reports, made contemporaneously, by the FTOs charged with training, observing, and reporting on Plaintiff, indicate that even if, *arguendo*, the comments by Officer Kropp and Sgt. Garner constituted direct evidence of sexism, Plaintiff would not be able to prove that these sexist beliefs caused CPD to recommend her for termination or caused CPD to take employment actions it would not otherwise have taken in the absence of such sexist beliefs. Rather, the record is full of evidence that CPD decided to terminate Plaintiff on the basis of her performance during probation and during the four Phases she was supervised by FTOs. The fact that the reports document the same weaknesses, essentially from the beginning, indicates that one officer's preconceptions or outdated beliefs did not unduly sway the decision-makers – or, in

the vernacular, "poison the well." Rather, her FTOs were consistent from the start in noting that Plaintiff had a specific set of weaknesses, and those apparently did not improve enough with time and practice.

For these reasons, even if this Court accepts, *arguendo*, that the proffered statements constitute direct evidence of sexism in the police force, Plaintiff is unable to prove her case by the theory of direct evidence.

### B. Circumstantial Evidence

If a plaintiff cannot or does not offer direct evidence of discrimination, a plaintiff may instead prove her case by circumstantial evidence. Circumstantial evidence is "evidence that, if true, proves certain facts and circumstances from which may be inferred other and connected facts that usually and reasonably follow according to" our common lived experience. 23B Am. Jur. Pl. & Pr. Forms Trial § 240. When a plaintiff seeks to establish a Title VII claim on the basis of circumstantial evidence, courts engage in the familiar *McDonell Douglas* burden-shifting framework.

First, the plaintiff must make a *prima facie* showing of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position relating to the employment action; and (4) either someone outside the protected class replaced her or was chosen for the job, or someone similarly situated to her but outside the protected class was treated better than she was. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004). If a plaintiff can make this showing, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the" adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer can so

demonstrate, the burden shifts back to the plaintiff to prove the employer's articulated reason is merely pretext. *McDonnell Douglas*, 411 U.S. at 804.

Here, there is no dispute that Plaintiff is a member of a protected class, that she suffered an adverse employment action, and that she was qualified for the position. (ECF No. 39 at 3). Therefore, the question is whether Plaintiff can satisfy her *prima facie* burden by offering up similarly-situated comparator. The Sixth Circuit applies three factors to determine whether employees are "similarly situated": the "individuals with whom the plaintiff seeks to compare his/her treatment must have: (1) dealt with the same supervisor; (2) have been subject to the same standards; and (3) have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

But Plaintiff fails to meet this burden – not because she and her comparator are insufficiently similarly situated, but because she does not attempt to offer up such a comparison. Twice in her memorandum contra, Plaintiff notes she has not identified a similarly-situated counterpart. (ECF No. 36 at 40 ("she has not identified a male comparator sufficiently similarly-situated to her for an inference to arise. Nor, as a matter of law, need she."); ECF No. 36 at 42 ("Officer Wheeler does not receive the benefit of a Fed.R.Evid. 301 presumption because, apart from being asked to dance on a table when the male probationary officer besides her was not, she has failed to show that similarly-situated males had their shortcomings treated favorably.")).

As a matter of law, Plaintiff is incorrect: to satisfy her *McDonnell Douglas* burden, she must at least name a single comparator, similarly situated, in order to shift the burden to Defendant to articulate a nondiscriminatory rationale for her termination. Plaintiff's brief repeats several times statistics to indicate that the Columbus Police Department employs more men than

women. (See e.g. ECF No. 36 at 3). Plaintiff only needed one male colleague who had the same supervisors, was subject to the same standards, and engaged in the same conduct without differentiating circumstances. Without more, Plaintiff cannot meet her burden with her assertion that only *she* was asked to dance on the table and none of the male probationary officers was asked to dance.

Assuming, *arguendo*, the table incident did constitute an actionable incident,[5] Plaintiff would still need to name the officers she believes were similarly situated but treated differently. But because Plaintiff does not even purport to offer a comparator, she cannot meet her *prima facie* burden under *McDonnell Douglas* and so her claim under a theory of circumstantial evidence must also fail.

### C. Mixed-Motive

A plaintiff alleging Title VII discrimination may also attempt to prove her case by arguing a mixed-motives theory. A mixed-motives theory is where a plaintiff argues that "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C § 2000e-2(m). In other words, in a mixed-motives claim, a plaintiff argues that "both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). For a while, courts required plaintiffs to prove a mixed-motives claim with direct evidence, but the Supreme Court held that, in order to obtain a mixed-motives jury instruction, "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any

---

[5] Plaintiff alleges this incident occurred once. If so, it fails to meet the threshold for a hostile or abusive work environment. The Supreme Court has explained that "simple teasing…offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

employment practice.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (quoting 42 U.S.C. § 2000e-2(m)). Because *Desert Palace* concerned jury instructions, the federal courts of appeals thereafter developed differing standards for summary judgment where a plaintiff presents a mixed-motives theory. *See White*, 533 F.3d at 398-400 (surveying the circuits). Answering that question, the Sixth Circuit held that "the *McDonnell Douglas/Burdine* burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims." *Id*. at 400 (emphasis in original). Therefore, to survive a motion for summary judgment, a "Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action." *Id*. (emphasis in original) (citing 42 U.S.C. § 2000e-2(m)).

Here, Plaintiff cannot sustain a mixed-motives claim for two reasons. First, Plaintiff does not appear to articulate a mixed-motives claim at any point in the Complaint or in her deposition. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) (holding "Plaintiffs must give proper notice when bringing mixed-motive claims."). Where the Complaint did not set forth this allegation, it amounts to a constructive amendment to allow a plaintiff to proceed on a different theory later in the litigation. *See generally Harvey v. Great Seneca Financial Corp.*, 453 F.3d 324, 329 (6th Cir. 2006) (allowing a plaintiff to present a new theory of the case is "two bites at the apple"). Plaintiffs instead must seek to amend the complaint under Fed. R. Civ. P. 15(a) in order to pursue a new theory of the case; otherwise, defendants would be "subject…to unfair surprise." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). And Plaintiff cannot present a mixed-motives theory for the first time in her response to the Motion for Summary Judgment. *See Bridgeport Music, Inc. v. VM Music Corp.*,

508 F.3d 394, 400 (noting a party may not "expand its claims to assert new theories…in response to summary judgment").

Plaintiff's best argument would be that the mixed-motives claim is asserted by inference in the Complaint because she alleges a Title VII violation and this Circuit's practice is to discuss each of the possible methods by which she could prove that case. In her memorandum contra, Plaintiff does cite the *White* standard of review and offers a conclusory assertion that there remain questions of fact that should be presented to a jury. (ECF No. 36 at 44-45). Then, in her deposition, Plaintiff gives no indication that she is pursuing a mixed-motives theory of the case. Opposing counsel frequently asked her why she believed she was fired, and her answers repeatedly confirm she believed it was because of her sex – and apparently, sex alone. One representative exchange was as follows:

> Q. Why do you believe that the comment that your reports are unintelligible made by Officer Kropp were made because you were a woman?
>
> A. I didn't see -- see or hear him say it once to any other officers 'cause I remember in that small little room that we were writing reports he was helping other officers. Now, I don't know who they all were. But there was quite a few of us in that room when I was writing reports. And he belittled me in front of other male officers. But I didn't hear him once saying that when he was assisting other officers. Like, You need to change that or, dude, you know, seriously. How many commas before -- or how many words before a comma? He never said that once to anybody else. In that little small room in that precinct there was numerous -- numerous officers in there working on reports that he helped with.
>
> Q. Okay. Why else do you -- any other reasons why you think that the comment that your report writing was unintelligible was based on your gender?
>
> A. Repeat that.

Q. So what you have told me is that you were in a room with other officers writing reports and you heard -- or he criticized you, but you didn't hear him criticizing anybody else in the room.

MR. MARSHALL: Male officers.

Q. What I am asking is: Is that the only reason why you think that him calling your reports unintelligible was based on your gender, or were there any other reasons besides what you've told me?

A. It was gender. He didn't want to work with females. He never said it once to any male officers.

Q. And I am asking for all of the reasons that you believe this. And you told me that you believe because you were in a room with other officers writing reports –

A. Male officers.

Q. -- and he didn't criticize them. I am asking: Are there any other reasons that you rely on to claim it was because of your gender?

A. Just handling the job.

Q. Ma'am – ma'am, this is going to be easier if we stick to this topic, okay? We are talking about the report writing.

A. Correct.

Q. We are talking about being in a room with you writing reports and male officers writing reports and him saying that your reports were unintelligible and you not hearing him say that to men. You said that's one of the reasons why you think that him calling your reports unintelligible was based upon your gender. I am asking you -- this is a very specific question. Are there any other reasons related to your report writing, related to him calling your reports unintelligible that you think were because of your gender besides that?

A. No. It was my gender.

Q. So there are no other reasons besides that?

A. Gender.

Q. Besides – ma'am, it's not –

MR. MARSHALL: Let her finish, Rich, whatever she wants to say and then you can follow up. But I don't want you to interrupt her chain. If you don't think you have gotten a response to the question, that's fine. But Sarah, say whatever you want to say.

A. It was my -- I mean it was my gender. He did not say it to any other male officers or criticize any other male officers in report writing. It was exactly me, and he was sexist.

Q. Okay. So outside of him not telling other male officers that their reports were unintelligible, are there any other reasons why you believe that he was signalling [sic] you out on your gender for your report writing?

A. For just my report writing?

Q. Just your report writing. We can talk about the other stuff later. But right now I just want to focus on your report writing.

A. I guess I don't know what you are asking me.

Q. I am asking you: Besides him not criticizing male officers, are there any other reasons why you think he was criticizing you for report writing based on your gender than just the fact that he didn't criticize male officers?

A. He didn't want me there.

Q. Why do you say that?

A. Because I'm -- I am a very strong and intelligent person that -- I was very active and I wanted to do the job. I wanted to be there. I gave 110 percent. And anything that he criticized me on or any other officers in the past, I took that criticism and I valued it. And I learned from it. I wanted to be there. He didn't want me there.

Q. He never told you he didn't want you to be there, did he?

A. His actions showed it.

(Wheeler Deposition at 208:16-213:2).

Pushed repeatedly by counsel to articulate her thinking, Plaintiff continues to assert that "gender" alone was the reason she was fired. In her Complaint and in her deposition, Plaintiff does not clearly indicate that she intends to pursue a mixed-motives theory. Even if it could be surmised

from the Complaint, the deposition is quite plain that she believes that sex alone was the motivating factor in her termination. For these reasons, Plaintiff cannot maintain a mixed-motives cause of action.

Assuming *arguendo* that Plaintiff has properly stated a mixed-motives claim which she asserted appropriately in her deposition, she nevertheless fails to meet the requirements as a matter of law. The relevant standard, where the protected characteristic "was a motivating factor for any employment practice," leaves one question open: to *whom* was Plaintiff's sex allegedly a motivating factor? The answer must be: the decision-maker.[6] The Sixth Circuit has upheld grants of summary judgment where the plaintiff alleging a mixed-motives theory could not connect ambient workplace bias to the bias of the decision-maker. *See Reed v. Proctor & Gamble Mfg. Co.*, 556 Fed. Appx. 421, 429 (6th Cir. 2014) (unpublished) (affirming a grant of summary judgment where "general statements" attesting to bias and animus "shed no light" on the decision-maker's motivations). *Accord Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (generally, in a mixed-motive case, there must be evidence of the decision-maker's animus and "isolated and ambiguous" comments are insufficient; see also, n.4, *supra*). *Compare Spees*, 617 F.3d at 393-94 (reversing district court's grant of summary judgment where plaintiff demonstrated a material issue of fact as to whether multiple people with the power to demote her did so on the basis of sex).

But even more simply, this must be so as a matter of logic. The Cat's Paw theory of discrimination allows a plaintiff to proceed if the bias of someone who influenced the decision-

---

[6] Or, in some cases, the animus may be on the part of a non-decisionmaker where "the speaker holds a management position, the statements are made in a relevant context (such as a meeting in which personnel decisions are made), or where other evidence of animus exists." *Griffin v. Finkbeiner*, 689 F.3d 584, 597 (6th Cir. 2012) (reversing district court's grant of summary judgment because the defendant Mayor met these criteria even if he was not the "decision-maker"). However, Plaintiff does not allege that anyone with decision-making capacity over her employment meets these criteria.

making process was not sufficiently cured by the ultimate decision-maker's thorough, independent analysis, investigation, and conclusions. (See §III.D, *infra*). Cat's Paw and mixed-motive cases would overlap and produce redundancy if a subordinate's bias infecting the process could provide a cause of action for both theories. Therefore, logically, mixed-motive cases require that it be a motivating factor to the decision-maker, where Cat's Paw allows that it may have been the bias of someone who *influenced* the decision-maker.

Having established that Plaintiff must, in order to sustain a mixed-motives theory, allege her sex was at least a motivating factor for the decision-maker, this Court now concludes that Plaintiff cannot sustain such a theory of this case. At best, as discussed above, Plaintiff's evidence for sexism in the workplace is "the table," involving Officer Kropp, and comments she alleges Sgt. Garner made during their ride-alongs. Assuming, as above, that these incidents are not so isolated as to be insufficient for a Title VII violation, Plaintiff *still* fails to connect the alleged bias of these men to the ultimate decision by Sgt. Suber to terminate her. Plaintiff is firm during her deposition that she was fired because of "gender," and she is clear that her evidence for this conclusion is what she perceives to be disparate treatment by supervisors of her and male probationary officers. She does not, and cannot, allege that her sex was a motivating factor for Sgt. Suber.

Either because Plaintiff has failed to plead properly her mixed-motives theory or because she cannot adequately support it, this claim must fail.

### D. Cat's Paw

In one of Aesop's fables, "a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, n.1

(2011). This fable, apparently introduced to employment law by Judge Posner in 1990, *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), has become known as the "Cat's Paw" theory. A Cat's Paw theory of the case "refers to one used by another to accomplish his purposes." *Marshall v. The Rawlings Company LLC*, 854 F.3d 368, 377 (6th Cir. 2017). In the employment context, "'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Id.* (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)). A plaintiff who asserts a Cat's Paw theory of discrimination seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub,* 562 U.S. at 415. *See also Vance v. Ball State University*, 570 U.S. 421 (2013) (applying the Cat's Paw theory to Title VII). The "honest belief" rule will not rescue a defendant in a Cat's Paw case because "the honesty or sincerity of the decisionmaker's belief is irrelevant. What is relevant is that the belief is rooted in a biased recommendation." *Marshall*, 854 F.3d at 380.

But evidence of a biased recommendation is not enough to sustain a Cat's Paw theory. Where the decision-maker "conducts an in-depth and truly independent investigation" such that the Court can be sure she "is not being manipulated by biased lower-level supervisors, but rather making a decision based on an independent evaluation of the situation," the employer may be able to defeat the claim of discrimination. *Marshall*, 854 F.3d at 380. To determine whether the independent investigation can absolve the employer of liability, courts do not apply a "hard-and-fast rule" but rather "the traditional tort-law concept of proximate cause." *Staub*, 562 U.S. at 420. Where a plaintiff can show that the bias of the subordinate was proximately related to the adverse employment action, she can maintain a Cat's Paw case. But where the employer can

show that it conducted an independent investigation and can demonstrate that "that the adverse action was, apart from the supervisor's recommendation, entirely justified," it may defeat the Cat's Paw claim. *Id*. at 421.

Therefore, to maintain a Cat's Paw case, a plaintiff must establish two elements. First, that the biased supervisor "intended to cause an adverse employment action for discriminatory purposes," and second, "that these discriminatory actions were the proximate cause of the ultimate employment action." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 956 (6th Cir. 2014). *See Chattman*, 686 F.3d at 351 (citing *Staub*, 562 U.S. at 422). In this context, "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424. It has already been established that Sgt. Garner did not have the power to terminate Plaintiff, but that does not compel the conclusion that he was not "empowered…to take tangible employment actions" against Plaintiff. This Court's analysis proceeds on the conclusion that Sgt. Garner's direct supervision of Plaintiff during her probationary period and his reports on her progress that would directly inform Sgt. Suber's ultimate decision constitutes "empowerment."

Plaintiff argues that even if Sgt. Garner was not the ultimate decision-maker, his sexism so permeated his reports on her progress that Sgt. Suber's decision was proximately related to his bias. Sgt. Suber would have had to do a thorough, independent investigation and CPD would need to establish that terminating Plaintiff was "entirely justified" even putting aside Sgt. Garner's recommendation. There is a genuine dispute of material fact with respect to each element Plaintiff must prove under the Cat's Paw theory, and therefore summary judgment is inappropriate at this time.

As to the first prong, what remains is a credibility determination based on the Cat's Paw theory. Plaintiff tells two stories of Sgt. Garner's sexism and hostility. In her Complaint and deposition, Plaintiff depicts a Sergeant who had it out for her from the beginning. He is asking her probing, sexist questions about how she is coping on the police force and more-than-insinuating that she belongs at home – or, at the very least, not on the police force. *See Price Waterhouse*, 490 U.S. at 250 (sex stereotyping is a Title VII violation). Plaintiff goes so far as to assert that Sgt. Garner falsified his reports on her progress in order to sink her candidacy because he was so convinced that women could not (or should not) be police officers. (ECF No. 36 at 1, 29, 30, 31, 32, 33) (citing Plaintiff's declaration).

But in the more-contemporaneous timeline Plaintiff wrote when she was engaging counsel, she depicts a different Sgt. Garner. (*See supra*, §III.A). True, this version involves Sgt. Garner asking her questions about her family and home life, but it is plainly for a different end. This conversation involves a concerned Sergeant, worried his charge is not progressing as she should, doing his best to discern the problem and to help her find a solution. He asks about her home life, which may be affecting her job performance. He also suggests Plaintiff speak to a former partner of his, another woman, who may have had similar struggles and who may be able to help. For his part, when Sgt. Garner was asked during his deposition about the conversation he had with Plaintiff, he recalls a version of events that seems to align more with Plaintiff's contemporary recollection than Plaintiff's version in the Complaint and in her deposition. (Garner Deposition at 100:9-101:16).

But ultimately, as this discussion shows, the question of whether Sgt. Garner's report was inflected with bias – or even falsified, though Plaintiff has offered nothing to support that assertion – is a credibility determination. And credibility determinations are quintessentially the

province of the jury. *Wheeler v. McKinley Enterprises*, 937 F.2d 1158, 1162 (6th Cir. 1991)

("Credibility determinations are for the jury."). *See Liberty Lobby,* 377 U.S. at 255 (1986)

("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge."). Plaintiff may explain her

memory to the jury, and so may Sgt. Garner, and the jury can ultimately resolve the question of

whether Sgt. Garner held sexist beliefs that filtered into his reports on Plaintiff's progress. All of

this goes to the first element in the Cat's Paw theory: whether Sgt. Garner, as Plaintiff's

supervisor, "intended to cause an adverse employment action for discriminatory purposes."

*Shazor,* 744 F.3d at 956.

Second, Plaintiff may proceed on a Cat's Paw theory because it is a disputed question of

material fact whether Sgt. Suber did a sufficiently thorough, independent investigation so as to

provide an independent cause for Plaintiff's termination, or whether Sgt. Suber's decision to

terminate Plaintiff was proximately caused by Sgt. Garner's alleged bias. In her deposition, Sgt.

Suber explained that she had a conversation with Sgt. Garner after his ride-alongs with Plaintiff.

(Suber Deposition at 100:1-17). She also explained that after she received Sgt. Garner's reports,

she "start[ed] to be concerned that this wasn't going as well as what I had hoped." (Suber

Deposition at 101:7-8). Sgt. Suber also testified that she received a call from Sgt. John

Cheatham, who "ran into" Plaintiff during the shifts she worked with Sgt. Garner (because he

was assigned to the same geographical area). (*Id.* at 102:11-103:22). Sgt. Suber explained that,

"unless it was so egregious" – citing shots fired, or a serious injury as examples – she couldn't

"imagine that one incident itself would ever lead to someone recommending termination." (*Id.* at

104:6-11). But, she continued, Sgt. Cheatham's call aligned with the pattern she was reading in

the reports about Plaintiff, written by Sgt. Garner and others. Asked, "And Cheatham's report

here fits the pattern that Garner reports in his ride-alongs later, at least some of it does?" Sgt. Suber responded, "Some of it. There's some consistency." (*Id.* at 104:14-17). Sgt. Suber also said she reviewed videos of Plaintiff, recorded by the patrol cars; she could not state with specificity how many videos, but she testified that she watched "[p]robably as many as I – were available at that time. […] There probably weren't a ton of videos, but, I don't know, anywhere from five to ten." (*Id.* at 115:1-9). Sgt. Suber testified that she was reviewing the videos to see if they aligned with the reports she was getting from Sgt. Garner: "I just wanted to see if there was any officer safety issues that I could – and the foundation of it would have been her probation evaluation. […] From Sergeant Garner." (*Id.* at 117:22-118:3). Taking together the reports from the first four Phases of Plaintiff's training, plus the report from Sgt. Garner, plus her independent review of Plaintiff's runs, Sgt. Suber was the ultimate decision-maker in Plaintiff's case.

The question for the jury is whether, and how, Sgt. Garner's alleged sexism influenced Sgt. Suber's decision. It is a question of fact whether Sgt. Suber's review of Plaintiff's files and performance was sufficiently independent or whether it was inflected by Sgt. Garner's alleged bias. Put another way, it is a question of fact whether the alleged "discriminatory actions were the proximate cause of the ultimate employment action." *Shazor*, 744 F.3d at 956. *See also Marshall*, 854 F.3d 368, 383 (concluding that the question of whether the supervisors influenced the decision-maker with their bias is a genuinely disputed material fact).

Plaintiff has asserted that Sgt. Garner held sexist beliefs, that he allowed those biases to inform and inflect his reports on her training, that he falsified reports to stymie her progress, and that his bias swayed the ultimate decision-maker, Sgt. Suber. By so alleging, Plaintiff has properly pleaded a Cat's Paw theory of liability. But there remains a genuine dispute of material fact on each prong of the Cat's Paw theory that Plaintiff is required to prove. Both Plaintiff's

credibility and Sgt. Garner's credibility are disputed. There is also a genuine dispute about whether Sgt. Suber's decision was independent of Sgt. Garner's alleged bias or whether her decision was proximately caused by his tainted reports. *Cf. Bishop v. Ohio Dept. of Rehabilitation & Corrections*, 529 Fed. Appx. 685, 698-99 (describing a sufficiently independent chain of events such that there was no proximate causation between the alleged discrimination and the employment action). These are quintessentially questions for the jury, and as such, summary judgment on the Cat's Paw theory is inappropriate at this time.

### E. The Ohio Laws Against Discrimination

Plaintiff has also alleged violations of the Ohio Laws Against Discrimination. R. C. Chapter 4112. The Ohio Supreme Court has held that federal case law interpreting Title VII generally applies to O.R.C. § 4112. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E. 2d. 128, 131 (Ohio 1981). *See Goodsite v. Norfolk Southern Ry. Co.*, 573 Fed. Appx. 572, n.6 (6th Cir. 2014). Defendants point this out in their Motion for Summary Judgment. (ECF No. 32 at n.3). To interpret Ohio law, federal courts "must look to decisions of the Ohio Supreme Court; when that court has not ruled on an issue, the federal court 'must predict how the court would rule by looking to all the available data.'" *Griffin*, 689 F.3d at 601 (quoting *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys. Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)). Therefore, sitting as an Ohio court, this Court concludes that Plaintiff has no claim under the O.R.C under her direct, circumstantial, or mixed-motives claim. To the extent that Ohio courts allow a Cat's Paw theory – and, if the Ohio laws are in fact pegged to Title VII, they appear to – Plaintiff may proceed on that theory alone.

## F. Retaliation

Finally, Plaintiff alleges her termination was unlawful because it was retaliatory. Both Title VII and the Ohio laws forbid retaliating against employees. Title VII proscribes discrimination against employees for their opposition to "any practice made an unlawful employment practice" or if the employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). *See also* O.R.C. § 4112.02 (proscribing discrimination against person who have "opposed any unlawful discrimination practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under" the anti-discrimination laws). An employer's action constitutes unlawful discrimination if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 58 (2006).

To establish a claim for retaliation, a plaintiff must prove that: (1) she engaged in a protected activity; (2) the defendant had knowledge of that activity; (3) the defendant took an adverse employment action against the employee; and (4) there is a causal connection between the protected activity and the adverse action. *Rogers v. Henry Ford Health System*, 897 F.3d 763, 775 (6th Cir. 2018). The question of what constitutes a causal connection in this case is complicated by the fact that Plaintiff is only proceeding on a Cat's Paw theory of discrimination. The Supreme Court has established that Title VII retaliation claims require but-for causation: "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ of. Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Applying this to a Cat's Paw case, the Sixth Circuit concluded that *Nassar* and

*Staub* together compelled the conclusion that if "the retaliatory actions of non-decisionmakers were nothing more than a motivating factor[…], then retaliation could not have been a but-for cause of the ultimate employment action." *Seoane-Vazquez v. Ohio State Univ.*, 577 Fed. Appx. 418, 428 (6th Cir. 2014) (unpublished). Therefore, a Cat's Paw theory of retaliation exists where: (1) non-decisionmakers took actions intended to produce a materially adverse employment action against the plaintiff in retaliation for her protected conduct; and (2) those retaliatory actions were a but-for cause of the decision-maker's ultimate materially adverse employment action. *Id*.

It is not entirely clear what Plaintiff is offering as her protected activity. In her memorandum *contra*, she appears to argue that her protected activity was refusing to dance on the table when Officer Kropp allegedly instructed her to.[7] (ECF No. 36 at 50). But then, Plaintiff goes on to argue that "complaints made to superiors are a protected activity under Title VII" and that when "she reported FTO Kropp's role in the dancing incident, she was not making a vague reference to sex discrimination." (*Id*. at 51). Finally, Plaintiff argues she has "adduced evidence that Sgt. Garner's evaluation was false and exaggerated in order to concoct a paper trail pretextually justifying her discharge. His real motivations were sexist, as his comments demonstrate, and retaliatory, as his changed treatment of her from their earlier interactions followed the dance incident…". (*Id.*).

Taking the facts in the light most favorable to the non-movant, as this Court must, this Court might understand Plaintiff to be arguing one of the following three scenarios describes her allegedly retaliatory termination. In the first scenario, perhaps the strongest case for Plaintiff,

---

[7] "Officer Wheeler reasonably perceived that being asked in front of an all-male precinct to mount a table and dance, when the male probationary officer standing beside her was not asked to do so, was sexist. She refused to do so. Opposition is broadly defined."

when Plaintiff was assigned to Sgt. Garner, Officer Kropp would have called Sgt. Garner to tell him about the table incident. In this scenario, Sgt. Garner would be retaliating against Plaintiff for having refused Officer Kropp's alleged request to stand on the table. Assuming, *arguendo*, that refusing to stand on the table constitutes protected conduct, there are further problems with this scenario, chiefly that Plaintiff offers no evidence that Officer Kropp communicated with Sgt. Garner and explained the table incident – and her refusal – to Sgt. Garner. Plaintiff does allege that she knows that Officers Kropp and Houseberg and Sgt. Garner "talked," but she offers nothing but a mere assertion that this is true.

> Q. So I'm just curious if you know if Officer Kropp had any input in the decision to terminate you?
> A. Did Kropp have any input?
> Q. If you know.
> A. Oh -- oh, of course he does.
> Q. How do you know that?
> A. Well, Kropp, Houseberg talked. Then Kropp, Houseberg and I know Garner talked.
> Q. How do you know Kropp and Houseberg talked? Were you there for it?
> A. They were on the phone and then they were outside when I was prepping the cruiser.
> Q. But my question to you is: Do you know if Officer Kropp had input in your termination?
> A. Did I hear his words? No. But obviously he is sexist. He doesn't believe that women should be there. So I think he has input.
> Q. And you base that on what?
> A. His demeanor. What he said […].

(Wheeler Deposition at 222:23-223:19).

In order for Plaintiff to sustain this chain of causation, she would need more than the bare assertion and speculation that Officer Kropp communicated to Sgt. Garner that she had refused to dance on the table when (allegedly) asked. Such a chain of events does not meet the but-for cause requirement. Officer Kropp was not a decision-maker in Plaintiff's case. Neither was Sgt. Garner. Plaintiff needs to be able to show that Sgt. Suber would not have terminated her *but for* the retaliatory actions of a non-decisionmaker. But Plaintiff cannot show this. Neither can she

entirely establish what those retaliatory actions by non-decisionmakers might be. Was Sgt. Garner retaliating on behalf of Officer Kropp? Because Officer Kropp, twice-removed from the process, could hardly have been the retaliatory non-decisionmaker in this context.

Consider the second possible scenario. In this instance, perhaps Officer Kropp communicated with Officer Houseberg, who assumed responsibility for Plaintiff's Phase IV. In retaliation for Plaintiff's refusal to stand on the table at Officer Kropp's request, Officer Houseberg gave Plaintiff a bad Phase IV evaluation. To support this argument, Plaintiff would need more than the bare assertion that Officer Kropp and Officer Houseberg communicated; as above, she does not offer this evidence. But perhaps more importantly, when Sgt. Suber gave Plaintiff another chance rather than agreeing with the conclusions of Officer Houseberg, this broke the chain of causation on any theoretical retaliatory action by Officer Houseberg on behalf of Officer Kropp.

Finally, consider the third possible scenario. When Officer Kropp stepped back and Officer Houseberg became Plaintiff's FTO, Sgt. Suber called a meeting, which was attended by Plaintiff, Officer Kropp, Sgt. Suber, and an Officer Vanderbilt. At that meeting, Plaintiff said she "expressed my side of the story reference to the table, in reference to the lies in the e-mail [from Kropp to Suber]." (Wheeler Deposition at 173:18-20). When asked what she had said about the table incident, Plaintiff said, "That I was told to dance on the table, stand on the table and give my speech. And that's what I told them. Other than that, I didn't elaborate on it." (Wheeler Deposition at 174:2-6). At that meeting, Plaintiff was told she was being reassigned to Officer Houseberg for Phase IV. (Wheeler Deposition at 174:23-24). In this scenario, the assumed protected activity is reporting Officer Kropp to Sgt. Suber and Officer Vanderbilt.

Plaintiff does not allege Sgt. Suber was retaliating against her for having refused Officer Kropp's request. Therefore, Plaintiff can only be alleging that somehow Sgt. Garner was retaliating against her for the table incident even in the absence of evidence that Sgts. Suber and Garner coordinated, and in the absence of evidence that Officer Kropp and Sgt. Garner coordinated. To assert that Sgt. Garner was retaliating against Plaintiff for an incident in which he had no part and about which it is possible he had no knowledge is, by definition, not a retaliation claim. If Sgt. Garner made up his mind before meeting Plaintiff, that may be cognizable as Cat's Paw, as above, but retaliation in advance – a sort of "pretaliation" – is not a cause of action.

Assuming *arguendo* that Plaintiff did engage in protected conduct, she nevertheless cannot maintain a claim that she was fired in retaliation for engaging in such conduct. This is because, proceeding on a Cat's Paw theory, she needs to establish *both* that a non-decisionmaker took retaliatory actions *and* that, but for that retaliation, the decision-maker would not have terminated her. The material facts in this chain of causation are not genuinely disputed. As to the claim for retaliation, Defendant's motion is granted.

## IV.     MOTION FOR LEAVE TO FILE

Plaintiff has also filed a Motion for Leave to File Sur-Reply. (ECF No. 40). The Local Rules for the United States District Court for the Southern District of Ohio permit sur-replies only "upon leave of court for good cause shown." S. D. Ohio Civ. R. 7.2(a)(2). Plaintiff seeks leave to file a sur-reply based on Defendant's "improper" impeachment of Plaintiff's Declaration. Plaintiff contends "a response is essential." (ECF No. 40 at 2). The issue appears to be that Plaintiff's Declaration, submitted with her memorandum *contra*, directly contradicts her deposition testimony. From this Court's perspective, this issue would seem to be eminently

predictable line of argument for Defendant to make. It is not clear to this Court why, in a memorandum *contra* containing fifty-five pages of argument, counsel for Plaintiff did not seek to rehabilitate her credibility or address the alleged discrepancy between the testimonies. Nevertheless, in an effort to allow a complete record for any trial and any appeal, Plaintiff's Motion for Leave to File Sur-Reply is **GRANTED**.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART.** There remains a genuine dispute of material fact on the Cat's Paw theory of discrimination: there is a question of fact and a question of credibility for the jury to resolve as to whether Sgt. Garner was biased against Plaintiff in violation of Title VII and whether Sgt. Suber's review was sufficiently independent so as to break the chain of causation. Defendant's Motion is **DENIED** as to the Cat's Paw theory. As to the direct, circumstantial, and mixed-motives theories, Defendant's Motion is **GRANTED**. As to Plaintiff's claims under the Ohio laws, Plaintiff may proceed only on the Cat's Paw theory, to the extent Ohio law mirrors the federal law on Title VII. As to Plaintiff's claim for retaliation, Defendant's Motion is **GRANTED**.

    **IT IS SO ORDERED.**

                        **s/ Algenon L. Marbley**
                        **ALGENON L. MARBLEY**
                        **UNITED STATES DISTRICT JUDGE**

**DATED:  August 8, 2019**